The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced. The times will be as allotted to counsel. The first case today is United States v. No. Salvador Perez-Vasquez, No. 181687, United States v. Hector Enamorado, No. 181975, United States v. Louis Solis-Vasquez, No. 191027, United States v. Enamorado, No. 191734, United States v. Solis-Vasquez, No. 191745, United States v. Perez-Vasquez, No. 191750. Attorney Hernandez, please introduce yourself on the record for the Court. H. Manuel Hernandez on behalf of Mr. Perez-Vasquez. Proceed, Mr. Hernandez. Thank you very much, Your Honor. May it please the Court. I would ask to reserve one minute for rebuttal, if I may. Yes, you may. Thank you, Your Honor. This is a case, as the Court is fully aware of, of a RICO indictment involving murders and drugs. Mr. Perez-Vasquez was charged in the RICO conspiracy, and amongst the allegations of his involvement were two killings, and then count three was a distribution of cocaine. Possession of firearms was in count four, and count five was the conspiracy to distribute marijuana. He was convicted of all counts except count four. He was acquitted on count four. Due to my time limitations, I only have seven minutes. I'm going to try to do my arguments this morning to what I believe are the two main issues, which is what I argued is the inadmissible co-conspirator hearsay and the use of agents, some of them testifying as expert witnesses, to summarize the government's evidence. I must begin by noting, Your Honor, for the first time in 40 years of doing this before this Court, I made a mistake, apparently, in the brief. Inadvertently, I left out, as I reviewed some of the witnesses, one of the government's witnesses, Mr. DePaz, Josue Alexis DePaz, who was one of the MS-13 gang members, who did, in fact, testify at trial. His alias is Gato. He was testified on day six and seven of the trial. Those are at transcripts 2680 and 2681. I can give you the page numbers if necessary. The government did, in fact, review his testimony at page 10 of the government's brief. I apologize for that to the Court. His testimony is important, particularly in regards to these issues. He testified about the killing of Fantasma, one of the MS-13 gang members, who was believed to have been cooperating with law enforcement. He testified about, alleged, the conversations he had with Perez Vasquez, my client, before and after the killing. It was an inadvertent error on my part. I, frankly, cannot tell you why. The issues, again, that I'm arguing, and again, I've never challenged, and I didn't challenge the sufficiency of the evidence in terms of the government's evidence at trial. My argument, in a nutshell, is that the District Court allowed so much what I argue is inadmissible hearsay under the guise of the co-conspirator exception Federal Rule of Agent Testimony, specifically Agent Woods, the case agent, and Agent Estevez, also the case agent, who also testified as expert witnesses, supposedly, regarding MS-13. So, they were allowed to take the stand, basically testify at length about their extensive experience investigating MS-13 gang members, all of the bad things and horrible things that MS-13 has engaged in, murders, you know, threatening and intimidating people, and then they wind up investigating the defendants in this particular indictment. There were 61 defendants, including Mr. Perez Vasquez, and then they testified. As I recall the transcript, and I've laid it out in some detail in my brief, all of the transcripts of conversations, and there were numerous conversations and meetings that were recorded. The government had an informant, specifically CW1 Pellon, P-E-L-L-O-N, who testified, and the government relied extensively on the transcripts of his testimony. He was an informant. He had a taxi service, basically, that the gang members actually used, and they would talk in there, and he would attend meetings, not as necessarily a gang member or necessarily even a co-conspirator in this, but he would attend meetings and record it. So, almost all of those transcripts came in through the agents after they summarized, after they testified as experts, supposedly, and then they came in through those particular agents. I believe only one of the... Mr. Hernandez, could you just lay out for me what is the legal claim that you're making? So, is the idea that it's per se impermissible for the expert witness testimony from the agent to come from an agent who's also providing testimony about the particular investigation? And if it's not that, what is the argument? Well, Your Honor, this court particularly has a series of cases, beginning with Casas, Flores de where the court has, you know, specifically criticized the government for using its agents as summary witnesses. That's a different point. It's one thing if the problem is that there's summary testimony about this case. I understand that. If there's non-summary testimony about this case, plus overview testimony about the gang as a whole, as expert testimony, the fact that it comes from the same agent, I don't see why anything in our case law that says that that's impermissible. Well, it's my understanding and my argument, Your Honor, that based on the holdings in Casas and Flores de Jesus, the government basically ignored what this court has admonished the government not to do, and basically did exactly what you just said in terms of they used the expert agents, they testified as experts, they then provided overview and summary testimony, and particularly with CW1, who was a critical witness. I call him the star witness in my reply brief. They brought in, through these agents, the transcripts of what went on with CW1, and then there was also a jailhouse recording, and much of this was after the fact. I respectfully submit it was chatter. Mr. Hernandez, I'm sorry. Judge Barron was asking a specific point. I take it from your answer your basic argument, number one, is that impermissible overview evidence was given, and that is a different argument than your concern about expert witnesses. Is that correct? Yes, Your Honor. I argue two issues, the overview evidence. And the overview evidence objection is contingent on us rejecting the co-conspirator exception, correct? Yes, Your Honor. Essentially. So essentially your argument is it was not co-conspirator testimony, and therefore there's a problem. There was an excessive amount of that co-conspirator. Yeah. Even if it was admissible, it was still prejudicial to put that much in. Right. And my argument, it wasn't admissible. I see my time is up. Thank you. Okay. Thank you. Thank you, Attorney Hernandez. You can mute your device at this time. Attorney Scappiccio, if you could unmute your device and introduce yourself on the record. Okay. Good morning, Your Honor. May it please the court. My name is Rosemary Scappiccio, and I represent Mr. Inamorato in this appeal. I'd like to address if I can, I'd first like to ask if I could save a minute for rebuttal with the court's permission. One minute, certainly. Thank you, Your Honor. I appreciate that. So I'd like to today discuss Mr. Inamorato, who I think stands in a little bit of a different position than many of the MS-13 defendants that you've seen. And that is because of the thin layer of evidence that the government presented to connect him to MS-13. And I think the government's main position and our argument with respect to Mr. Inamorato is whether or not the mission statement to go and kill Chavales is enough to show that a specific intent to commit the predicate acts. And we suggest that it's not under the circumstances of this case, especially where Mr. Inamorato, during the pendency of this investigation, was not on any wiretaps, didn't attend any meetings, didn't pay any tribute, didn't deal any drugs, wasn't involved in any gun running. And none of the, neither of the agents, either Trooper Estevez or Agent Wood, even knew of the existence of Mr. Inamorato until the date of the homicide on December 14th, 2014. And so with that, the government then is in a position to have to prove knowledge and specific intent. And the knowledge requires some advanced knowledge of the mission of the clique. And so the government... Mr. Counsel, just, I want to be sure I'm understanding. This is not an argument about the witnesses who identify him as the killer and who identify him as, well, this is an argument that he may have done that, but he wasn't part of MS-13. And the evidence to support the RICO conspiracy involving MS-13 is too thin. Is that what you're doing? It is, Your Honor, except that we're not conceding that he committed the homicide, but for the purpose of this argument... Oh, okay. Okay. So there is evidence, I've forgotten the nickname, La Vida Loca, something like that, of three different witnesses, I think, who say that he is that person. I agree, Judge, for the purpose of this argument, for the purpose of the RICO argument, if you assume that he committed the homicide, and we're still contesting that, but if you do assume it for this argument, then the argument becomes the RICO statute and does the general mission statement to go kill Chavales put Mr. Inamorato on enough notice that he was specifically intending to commit predicate acts. And in this case, because of his lack of participation... But I'm sorry, we're at cross purposes. A number of witnesses specifically identified him as an MS-13 member who had this particular nickname. So why would it turn on the mission statement? Well, because, Judge, there's no indication as to... First of all, there was no evidence at all about the Chelsea click. We don't know a thing about Chelsea. The government presented no evidence. If you assume that he was at a different meeting, which isn't what the experts say happens in MS-13, we don't know what was presented at that meeting. We don't even know when that meeting took place. Did it take place six years ago? Did it take place within the context of the conspiracy? We don't know because the government didn't present any evidence of that. And so the mere fact that somebody is going to say he's known as Vitaloka isn't enough in my to suggest that they can then rely on... Counsel, can't people... People can join conspiracies at different times. Your suggestion that... I understand you dispute that he was responsible for the murder of Mr. Ortiz, but even if there was not evidence over a substantial period of time prior to that murder, that he was involved with MS-13, I mean, if there was testimony that at that time when that murder took place, that he was aware that Ortiz was a member of a different gang, that there had been ongoing controversy between these two gangs. And I mean, he was aware of sort of the gang rivalry at that time and that he carried out that murder as part of that ongoing conflict between the gangs. Why wouldn't that be enough to establish his involvement in the RICO conspiracy, even if there was not a lot of evidence of his prior involvement? Because there's no evidence that he actually committed this crime in furtherance of MS-13's motive, MS-13 gang. The only reason it becomes a federal case is because of the connection to MS-13 under RICO. If this was a straight state court case, they could present whatever evidence they wanted. But in this case, the only thing that makes the federal government have jurisdiction is the connection to RICO. And the connection to RICO... Why isn't the circumstantial evidence of his intent to further MS-13's purpose is sufficient? I don't... What's the problem there? So in other words, if there's enough evidence to say he's a which I don't think you're disputing either of those points. In other words, there's testimony saying he was an MS-13 member and there's testimony saying he did this killing. Then the question is, you're right, you still have to show he did the killing in furtherance so you can say that he was part of the conspiracy. But given the other testimony that's out there about how MS-13 operates, what's wrong with the inference that he was? Because how do we... Because the evidence that MS-13 operates in a certain way is, again, a general versus specific intent. And so if you have general knowledge about the way that MS-13 operates, do you have specific intent to have committed the predicate act? That the reason that a juror could say reasonably you do is because of then what he did. But in this case... If he hadn't done the killing, you might say, well, just because that's out there doesn't necessarily mean he joined the conspiracy just by being a member. But can't a jury reasonably say, well, he was a member who then did this killing and look at the evidence about how MS-13 operates, why can't I infer he did it in connection with the conspiracy that's charged? Because in this case, if you look at the jury questions and the judge's answers to the jury questions, the jurors were talking about Mr. Inamorato as an associate, not as a gang member. Those two questions are talking about whether or not somebody who... When is somebody an associate? What's the definition of an associate? Put aside the jury question, just stick with the insufficiency argument, which I thought you were saying, even properly instructed. You're saying the evidence is not sufficient to show he was part of the conspiracy, and I guess I'm still not grasping what's the problem with the circumstantial inference. Well, the circumstantial inference for... I didn't mean to interrupt. Go ahead, Your Honor. No, go ahead. The circumstantial evidence with respect to Mr. Inamorato comes down to the testimony of the agents. This isn't a situation where Mr. Inamorato himself had any evidence, any conversations with anyone. It isn't a situation where he self-identified as an MS-13 gang member because he has a tattoo. It isn't a situation where somebody took pictures of him going into a meeting. There's nothing. There's nothing to suggest that Inamorato... Let me just ask you one last... Let me ask you one last way. Suppose we had somebody who it was incontestable they were a member of MS-13, they acknowledge they're a member of MS-13, and they do this killing, and then we have expert testimony about the mission of MS-13. Could that person be convicted of being part of the conspiracy? Not without evidence to support the expert testimony. In other words, if somebody, if an expert got on the stand and said somebody got shot in the head, this proves somebody got shot in the head, and then you don't introduce evidence that somebody got shot in the head, then where's the evidence to suggest what the expert's saying is true? And that's what happened in this case. There was a lot of expert testimony about what the gang did and could have done and should have done and maybe did in different countries, but where's the actual evidence that it happened here and that Mr. Inamorato was either part of it or aware of it? And that's what happened. I understand there's a confession that you involved in this murder and why he did it and who helped him. There's a great deal in there, right? If you believe the police officers, which Mr. Inamorato contested, but if you believe the police officers, then Mr. Inamorato said he was an MS-13 gang member and that he doesn't remember specifically what happened with respect to the murder, but if he did the murder, it was for revenge. That's what he said. Now, does revenge mean revenge on behalf of MS-13 or does revenge mean because I got beat up two nights ago, I'm taking revenge? We don't know. That's the statement in and of itself. And without actual evidence- That's for the jury to sort out, right? It is for the jury to sort out. But again, I'll come back to what the jury found with respect to Mr. Inamorato, which is that he wasn't a gang member, that he was an associate. And the government tried this entire case on the theory that he was a gang member. And there was no evidence in the record whatsoever what an associate did. Did an associate attend meetings? Did an associate have knowledge? Did an associate have specific intent? All of that evidence is lacking, even when we add in the expert testimony. That is just testimony. It's not actual evidence, but it's testimony about the interpretation. One last pass. One last pass because I think you seem to be shifting between two positions. I want to make sure I understand what your position is. One position is he was not a gang member. He was just an associate. The evidence isn't sufficient to show he was a gang member. I thought you were also making an argument that even if we rejected that, we thought the evidence was sufficient to show he was a member of MS-13. The evidence is still insufficient because there's no evidence that he knew the mission of MS-13 was to kill two olives. So just sticking with that last point, okay, is the sole contention there that although there's testimony about what the mission of MS-13 globally is, there was no evidence that this particular clique of MS-13 had that mission. And even if you confer that they did, there's nothing suggesting that he knew that was this clique's mission. That's the argument. It is. In addition to what was... We don't even have any evidence with respect to Mr. Inamorato as to what his place in the organization was. We don't know whether or not he would have reason to believe and know what's going on because no one introduced any evidence as to the Chelsea clique or any role that Mr. Inamorato was alleged to have had. And so that's exactly what it is. Okay. Thank you, counsel. Thank you. Okay. Attorney Scapiccio, you can mute your device at this time. And Attorney Gold, please unmute your device. Attorney Gold, you have four minutes. Please introduce yourself on the record. Good morning. My name is Ian Gold. I argue on behalf of Appellant Luis Solis-Vasquez. May it please the court if I might reserve one moment for potential rebuttal? You get a minute. Yes. Thank you. Your Honors, Mr. Solis-Vasquez makes three arguments essentially... or advances three arguments based on the Ortiz murder sequence. We argue that the evidence was insufficient to find Solis guilty of murder, first or second degree beyond a reasonable doubt, and that the jury's verdict or the jury's special verdict should be in finding that Mr. Solis was responsible for first degree rather than second degree murder in making his guidelines or making its guidelines calculations. This had an effect of... we argue that this error, in addition to other errors, would have led to a dramatically lower guideline calculation, which had an impact on the resulting sentence. And lastly, we argue that based on the sequence of facts that was presented to the jury and in front of the district court, the district court erred in awarding restitution to the victim of the attempted murder in the Ortiz sequence, Sol Rivera. If the court is aware that there was a restitution hearing after the sentencing hearing in which the district court ordered the three defendants or three appellants here to pay restitution jointly and severally, although ordered Solis-Vasquez to pay half of the amount that the other two are responsible for. The argument starts with a similar place that my co-counsel argued, which is that what we have here is a bootstrapping of MS-13's fearsome motto, kill, control, rape, into a all-purpose inference that every attack that we have evidence for is one with murderous intent. But when you focus with attention on what the evidence of the Ortiz murder actually showed, what it showed was certain facts. And we argue that the percipient witnesses here are the lodestone here that the court and the jury was really obligated to use as more reliable than some of the other evidence that might contradict or undermine this argument. But essentially, we have good data about what was observed when the Ortiz murder took place in the form of the testimony of the two eyewitnesses who witnessed the attack. Can I ask you just one question about the restitution issue? Yes, your honor. You're making an argument that because it was a conspiracy offense, it can't have qualified as a triggering offense for restitution. Your honor, we make an argument in three separate components. That is the first, and that is correct, that the Mandatory Victim Restitution Act relies upon 18 U.S.C. section 16a for its definition of a crime of violence. That puts us in the realm of the categorical analysis and that RICO conspiracy does not qualify. This was not raised to the district court, but we argue that it was a plain error that the court should recognize. Then we have two other challenges to the word of the restitution order. All right. The government makes the point that RICO is in a way a divisible offense, and if you have a predicate act such as murder, which is clearly a crime of violence, that there's no problem. How do you respond to that? Well, your honor, I have the first response to that is specific to this case, which is that we start to, even if that were the case, in this case, the victim who's being awarded restitution is not the victim of the divisible offense, if the court follows my meaning. What makes it divisible is one special verdict of murder and conceding for the sake of argument that murder is an indivisible crime of violence. Massachusetts murder is a divisible crime of violence under the court's precedence, but then Mr. Rivera, the victim here who was awarded restitution, was not a victim of that offense. He was not a victim of the special verdict. I have one follow-up question. Go ahead and finish your answer. That's my first response. It follows on Judge Lopez's question, which is just so I understand how the legal conspiracy offense works, given its divisible quality. In this case, the predicate act of murder that's tying your client to be a conspirator, therefore guilty of the offense, is a predicate act he's claimed to have committed, correct? Your Honor, just so I... Could you repeat the question? I'm sorry, Your Honor. It's a question that the appellant has claimed to have committed? Is that... That the government claims the appellant committed? Yes. Is that necessary to the offense? In other words, the way the offense is constructed, to be guilty of the conspiracy, there has to be a predicate act of murder, and you have to agree to be part of the conspiracy. It's not necessary that you be proved as the person who committed that predicate act. It just happens in this case that that is how they're proving him to be part of the conspiracy, correct? I view this in the following way. The conspiracy conviction is an agreement which, in theory, would not require proof of any predicate act at trial, but simply intention to commit or more. And it just happens that the way they proved it here was by making the case that he committed the predicate act of murder, correct? Uh, yes. I would... I don't know that the government's theory of the case would... Depend on that? Depend on that. That they have their RICO conviction based on... Just so I follow the argument, the idea would be for purposes of the categorical inquiry, it's irrelevant if the evidence was overwhelming that in this case your client had committed the murder that's the predicate act because the nature of the offense is such that there's no requirement to prove any violent conduct by the defendant himself. That's the categorical analysis. That's where we start. Yes. Okay, thanks. Thank you. Thank you. Thank you. Attorney Gold, you can mute your device at this time. Attorney Ralston, if you could unmute your device. Good morning, your honors. You have 20 minutes. Please introduce yourself on the record. Thank you. Thank you. Good morning, your honors. May it please the court. Sonia Ralston for the United States. I'd like to take the issues this morning in the order they've been presented to the court thus far. The easiest way to resolve each of these issues is on the standard of review. First, as to the co-conspirator testimony, the argument made this morning is different from those made in the briefs. It is that there was too much, though admissible, co-conspirator testimony amounting to a prejudicial effect. That's a 403 objection. That objection was not made at trial. It was not made in the briefs. It's both waived and, if not, on plain error review and no error is clear or obvious. As we explained in our brief, however, the testimony was properly admitted and the district court committed no error. Next, as to the law enforcement testimony, most of the expert testimony here, just to clarify, came in through Agent Norris, who was not a case agent in this case. This was done specifically to avoid the dual capacity problem that was hinted at by my opponent. Agents Wood and Trooper Estevez gave, I think, about three pages each of what could be considered expert testimony, but the bulk of their testimony was from their personal knowledge. It was authenticating exhibits. It was reading the admitted transcripts to which there had been no objection when they were entered. So, there's no overview testimony. They're not summarizing witnesses. They're not any of the things that this court has been concerned about in Casas and Forest de Jesus and those other things. So, here, you know, there's no lack of personal knowledge. They're just testifying about things that they essentially did in the course of the investigation. Agent Wood was the supervisor for the confidential informant for CW1, and so he's explaining how that was set up, how the recordings worked, and providing that authentication. Next, as to the sufficiency for Mr. Annamarato, there were three cooperating witnesses who identified him as a homeboy in MS-13. That's not an associate. That's a full-fledged member. He confessed that he was a member of MS-13. That alone is sufficient to support the jury's verdict, and again, the standard of review is whether any rational jury could have found the elements of the crime beyond a reasonable doubt. My opponent suggests that there was no evidence regarding the Chelsea click. I think that ignores what's in the record at page 1350-51, where Innocente explains exactly why there's no evidence about the Chelsea click, because it had essentially been disbanded and thrown apart by the leaders in El Salvador in favor of the Enfermos click. That said, there's evidence from the cooperating witnesses that Annamarato was still part of MS-13. He was a homeboy. He was introducing himself to members of the other clicks. He was gathering with them, and I think the most telling piece of evidence is when he needed a gun, who did he call? He called other MS-13 members. Their numbers are saved in his phone under their MS-13 gang names. He asked them to come to bring a gun, and the entire premise of this fight that he's then going to seek revenge of was that it was a gang fight the night before. If you look in the record, the transcript 214, this is at the Solis-Vasquez appendix, page 565, when Perez-Vasquez on that recording is explaining the fight, he says that the night before, even though Annamarato was outnumbered by the 18s, he engages them in a fight, shouting, and that is, he's invoking the gang as the justification for the fight. Then he goes back the next night, sees them again, and the justification here, now he's going to kill them using MS-13 to get the gun, to get the backup, to get the cover, to hide the gun, to get out of state. It's all MS-13. Finally. Can I ask you, but before you leave, since you just mentioned this gun issue, Annamarato makes the argument that, I think it's Perez-Vasquez's counsel at trial, says LaVita Loca got the gun from Perez-Vasquez, which does concern me some, and that I think there was a timely objection to that. Why is that not a problem? I think three answers. The first is that if you read carefully that closing argument, he says LaVita Loca when he's talking about before the shooting, and he only says Annamarato when they're talking about the getaway car, when, to be honest, they were arrested in the car together, so you couldn't really deny that Perez-Vasquez and Annamarato were in the car together. So before then, he doesn't say that LaVita Loca and Annamarato are the same person. He says LaVita Loca called for the gun, and as a gang member, he had to oblige. If I didn't, what's your next one? It's an inconsistent defense, which happens all the time in conspiracy cases. Here's the thing that's different. What's different about that is the cases that you rely on, like the heroin dealer case. The thing that's just different here is the worry is that the opposing person's not just saying, I have no knowledge of it, but he's a heroin dealer. My client doesn't know anything. This is, my client knows something. He gave the gun to that person. I don't know that we have a case like that where the concern is that the opposing, the other defendant is effectively testifying about his personal actions that are inconsistent, directly contravening the defense of the other party. That seems pretty troubling to me. So I understand your concern, but I don't think it's quite that troubling, in part because Annamarato presented two defenses. But I don't know of a case that suggests that, well, it's okay for your co-defendant to knock out completely one of your defenses as long as you can bring some other defenses. That too, and they were both consistent with what Perez-Vasquez said. The first was that Annamarato and Vita Loca are not the same person. The second- Yeah, but he had another, what I'm saying is he had a defense that he didn't get the gun. You're saying he didn't do it, but that defense is different than a defense of even if he did it, he had a reason, he could be excused from having done it or something like that. Whether the gun went to him, part of his defense was he didn't get the gun, right? His defense was not that Vita Loca didn't kill Ortiz. It's that I, Annamarato, am not Vita Loca. And I think that's consistent. The second one is that he was drunk, and so he lacked the intent. Both of those are consistent with what Perez-Vasquez says, which is Perez-Vasquez was called by Vita Loca to bring a gun. Yeah, but then that's contingent on whether what Perez-Vasquez was saying, basically fingered him as being Vita Loca. I'm sorry, I just don't read it that way, because the distinction between before the shooting, when we're talking about who's making the phone call. Also, we have phone records proving who made the phone call. And so the question is, is this a manifest abuse of discretion for the judge to have denied a mistrial motion during the closing argument after the five-week trial? And I don't think it is. I think the evidence is overwhelming to support what Perez-Vasquez's counsel said. How did the trial judge respond to this? He's confronted with a motion for a mistrial, and he denies it, obviously. Does he do anything beyond that? Other than giving, as part of his charge to the jury, pointed out the statements of counsel are not evident. He did not do anything to address the unusual circumstances that occurred in that closing argument. Is that true? So the court denied the motion for the mistrial, which, to be clear, was premised on the fact that Perez-Vasquez's counsel had become a witness against Ana Morado, which is certainly not true, because the statements of counsel are not evidence. It's not a witness. And then after that, there's no motion for a limiting instruction. There's no basis of inconsistent defenses. It's just a blanket kind of vague motion for a mistrial. So I think that on the record, as it was presented to the district court, there's no manifest abuse of discretion. There's no injustice here. And I don't think that this needs to be remanded for a new trial, because the district court presented with the objection as it was, I think handled it appropriately. Had there been a request for a limiting instruction, that could have been appropriate, but there wasn't. And so, you know, when you're talking then about whether the lack of a limiting instruction is plainly erroneous, or at this point, it's waived because they didn't raise the lack of a limiting instruction on appeal. And his, you know, his argument as it's raised on appeal is that this was a brutal violation. And that's certainly, there's no support in any case law anywhere for that being true. So I think you have to- Can I just ask you, you know, we've had this case accurately recently, where we suggested that counsel's question could give rise to a Crawford problem. So I was having trouble seeing why counsel's statement here couldn't give rise to a Bruton problem. I didn't quite see how you could distinguish those circumstances. I think it's very different for the reason that often a question, the way a question and answer go together, that they're intertwined. And so for the answer to make any sense, you need the question. So if the answer is yes, yes doesn't make any sense without knowing what the question was. So often I could see how a question and answer might go together and make the question essentially part of the testimony. An argument is completely separate. The arguments are never testimony, they're never evidence, they're never the basis for a sufficiency argument. And so, you know, an argument, and the arguments are set apart specifically by an instruction that the arguments of counsel are not evidence. So I think that it's different in that way, that even if a question in some circumstances could be so intertwined with an answer as to become testimonial, that doesn't mean that an argument of counsel ever could be. And to the extent that there's any case law on this, it's admittedly from other circuits, but it says, you know, it rejects this type of argument. One last thought on that. I take it how, if you say it's argument, suppose counsel is understood to be relaying a statement by the defendant. That's the worry. I suppose, but I still think, I mean, imagine. So just, and as your argument here that you can't read this record in any clear way to, so that counsel could be understood to be, instead of commenting on the evidence, relaying, purporting to relay evidence from her client. I don't think so. I think all of the things that she's talking about are things that other people testify to. You know, the existence of the phone calls, the, what was said on those phone calls, you have that on both the recordings. You have Muerto, who was present when that phone call was received by Perez Vasquez. And he, you know, says what happened on that phone call. So I think all of that is, he's just relaying, she, I'm sorry, is just relaying the evidence there, or I'm sorry, I think it's he, but just relaying the evidence as it came in. I'll be sure I understand you're saying that if you look at the closing argument of Vasquez's counsel, I think just building on Judge Barrett's question, you're saying that everything that was said there reflects evidence that is in the record, that counsel was not in making those seemingly odd arguments, sort of acknowledging to some extent the culpability of his client, and so doing, implicating Mr. Enamorado, that in one way or another, there was evidence in the record that would support everything that counsel was saying. Counsel was not, in the guise of a statement, in effect creating evidence that was not already in the record. Is that what you're saying? Yes, Your Honor. All of the statements in the closing argument are acknowledging evidence that was presented in the case, evidence from the witnesses, documents. Ms. Ralston, earlier you made the point that the only thing before the court was a mistrial motion, and that it was framed in very narrow terms, and there was no subsequent request for either severance or limiting instruction. One can understand why perhaps no limiting instruction would have been requested. Why emphasize this point? But as to the potential Bruton issue, was that ever raised in that motion before the district court? I think so. The transcript's a little fuzzy, but I think it's a mistranscription. It says at page 2437, I need to move for a mistrial judge. The co-defendant has just become a witness against my defendant without notice in violation of Bruton, and there's no way this jury is now going to be able to give him a fair verdict. So I think that the basis of the motion is a mistrial on the basis of a Bruton issue where the co-defendant has become a witness against him when the co-defendant didn't testify, the argument isn't evidence, and the jury was instructed. Just so I get it though, one way to read that somewhat more charitably than you're reading it is that became a witness through counsel's relaying statement by him. Now you're saying that we can't read the record to have counsel relaying a witness? Is that right? Yes. I just wanted to make clear that there's still an element of discretion for the district court here, and the district court didn't abuse that discretion. Did the district court articulate its reasons for denying the mistrial? I haven't had a chance to go look at the transcript. No, the district court, the motion, he says you're referring to Mr. O'Hara, that's Perez-Vasquez's counsel, his argument, he says yes, and the court says okay, the motion is denied. Okay, thank you. Yeah, and that's at 2437 in Anna Murado's appendix. Okay, so Solis-Vasquez's arguments, the sufficiency, the intent, I think the key point to look at there is that the standard is not, he didn't have to intend to kill, he had to intend to do an act that in the circumstances known to the defendant, a reasonable person would have known created a strong and plain likelihood that death would result. When two MS-13 members show up to an apartment with guns to retaliate against a member of a rival gang, I think it's pretty obvious what's going to happen there, and the jury certainly could have found that intent. Counsel mentioned the sentencing, but didn't go into that at all, so I think the briefs cover it, and then on the MVRA, I think this is an interesting issue, as the court was talking about, I want to kind of clarify that last point that my opponent made at the end, where he says that Rivera is not a victim of the offense that would make it a crime of violence, and the MVRA deals with that. Section 3663, Cap A, A2 defines a victim as someone, quote, directly and proximately harmed as a result of the commission of an offense, including in the course of a conspiracy. So if the aggravated conspiracy is a crime of violence, then Rivera, having been harmed in the course of the conspiracy, is a victim of the aggravated offense. So I think that kind of factual argument falls away. So yeah, we'll just get to whether the aggravated conspiracy offense can be a crime of violence. Do you have, is it possible to prove the offense without proving that any actual predicate act occurred? I don't think so, and certainly not, so it's possible to prove the underlying conspiracy offense. To prove the aggravated offense, I don't know. I would have to go look at the statutory language. I don't think so, but I don't, sorry, I don't have it in front of me right now. Because I guess I have trouble seeing if you don't have to have committed one of the predicate acts, and it's possible to prove it as conspiracy. I think our case law is fairly clear about the problem with calling a conspiracy offense a crime of violence, even when the conspiracy is to do violence. Yeah, I understand that. I think it seems odd to me that we would have charged and put the verdict form here this way if that, if we could have proved that they only intended to kill somebody, and we didn't have to prove that they actually did. Well, see, the problem is it's just, it's the difference between the the easiest way to prove the conspiracy was committed was through this, but from a categorical perspective, if you didn't need to do that, then it's hard to see categorically how it's a crime of violence under our case law. Yes, I agree. I agree. So, I'm not having the statutory section in front of me. Okay, so within seven days after the argument, please submit a 28-J letter on this point, and your opponent who's raised this issue has seven days thereafter to file a response. Will do. Thank you, Your Honor. I think it should be a straightforward yes or no answer, so I'll get that to you soon. I think that if it does, right, then we're talking about where we have an added element, right? Mathis tells us that if you're increasing this penalty, you're adding an element, and here that added element is the murder which was proven and the jury found. Okay, so if there are no further questions, thank you. Okay, thank you, counsel. Thank you, counsel. Attorney Hernandez, if you could please reintroduce yourself on the record, you'll have one minute. Thank you. Thank you. H. Manuel Hernandez, again, from Mr. Perez Vasquez. Very briefly, I'm just going to read straight from my reply brief at page three, page four, I'm sorry. In terms of the government's argument that somehow I forfeited away this and I haven't raised it, that's simply not true. In both briefs, I talked about the fact that there was just this flood of evidence on the record that was inadmissible, and whatever the government's evidence is, it was all tainted as a result. In fact, this is the language at page four. The result of the government's almost limitless witness testimony by agent proxy was a trial record flooded with inadmissible co-conspirator and or gang member hearsay that fatally tainted the government's entire case and seriously prejudiced Perez Vasquez. On page six of the reply brief, given the significant amount and highly prejudicial nature of the inadmissible purported co-conspirator totem pole hearsay evidence eventually admitted during the trial, there can be no claim of harmless error. In the actual brief, the initial brief at page 45, I talk about the admission of so much of this evidence was highly prejudicial and deprived Perez Vasquez of his right to a fair trial. Counsel, I have a question. In your brief, what you're complaining about is that you don't think Petra's yellow covers what you call idle chatter, and it wasn't in furtherance of the conspiracy. So later, when you're making your objection about such evidence, are you, the way I understood it, you were referring back to your inadmissible because it was not in furtherance of the conspiracy? Yes, your honor. Much of the evidence that was admitted through agent proxy testimony, witnesses didn't come to testify, it was the agents, was what I would respectfully submit, chatter, narrative, it wasn't. Okay, therefore, suppose we reject your premise, you did not make an explicit 403 argument on the basis that, gosh, there was just too much of it in any event. That, I believe, is the government's point. I did not cite rule 403. I did argue the denial of his due process rights and his right to confrontation, and I believe by implication argued that the government presented too much of this inadmissible hearsay evidence and denied him of his rights, but I did not cite 403. Okay, thank you. Thank you. Mr. Hernandez, you can mute your device at this time. Attorney Scappiccio, you can unmute your device and you have one minute of oral argument. Thank you. I'd like to address the closing argument issue that was raised by the government, and in that case, I'd like to point the court to page 31 of my initial brief. This is the gun in Vasquez's hands when he said, when he provided that gun to Vidal Loca, he didn't know Vidal Loca was going to kill and shoot a rival. Then he also said that he didn't know that there was a rival who had been shot until the following day, and then he also said that he did not share the intent that Vidal Loca had to kill someone when he pulled that trigger. Those were all relaying statements of a co-defendant. Where's the statement by the co-defendant? The statement, I would say, is that he provided the gun. The statement is that he didn't know that the person was... So he says he provided the gun? Yeah, but just so you can sync up with the government's argument, if the evidence is fairly read, independent of any testimony about what your client said, to support the inference that he gave him the gun, then couldn't counsel's statements there be understood as commenting on the evidence rather than relaying evidence? Well, I think that they are relaying evidence because the theory of the defense was that these cooperating witnesses were not truthful. They were in it for... Can I finish? Yes, please. Thank you. That they were in it because they were being rewarded. Where is the co-defendant's reward for making that statement? So it undercut the entire defense that Mr. Hernandez had raised relative to, it wasn't me, I didn't do it, and I didn't know that they were MS-13. He cleared that all up with his closing argument, claiming that he did know, that he handed him the gun, and that he shot. Okay, thank you. Thank you. Thank you, Attorney Scarpiccio. Would Attorney Gold please unmute his device? He has one minute of rebuttal. May it please the court. I'd just like to respond to the government's statement regarding the second degree murder, which she briefly stated that the standard is that the intention to do an act which a reasonable person would foresee would result in death is an argument that we and is inconsistent with the Massachusetts case law and the standard that as it was developed and as it was presented to the jury. We're arguing that the facts as Mr. Ortiz was observed, as Mr. Solis was observed, is someone who enters during this scene, walks across the room, leaves the apartment, and then the killing takes place. So the acts that Mr. Solis took, or known to have took, as opposed to, or known to have taken, are not supportive of an intent as to him, of an intent to kill. That's time. Mr. Gold, just one question. You're making this argument in support of your sentencing argument. Is that correct? Well, the factual argument, it really serves both arguments. The sufficiency argument as well. Okay, got it. Thank you. Thank you, Mr. Gold. Attorney Hernandez, Attorney Scapiccio, Attorney Gold, and Attorney Ralston, you may disconnect from the meeting at this time.